Filed 7/9/26  P. v. Jones CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RONALD ANTHONY JONES,<br><br>    Defendant and Appellant. | B341942<br><br>(Los Angeles County<br>Super. Ct. No. A578017) |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Eleanor J. Hunter, Judge.  Affirmed.

Marilee Marshall, under appointment by the Court of Appeal, for Defendant and Appellant Ronald Anthony Jones.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, and Blythe Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.

# I.     INTRODUCTION

After his first murder conviction was vacated based on race-based discrimination during jury selection, defendant Ronald Jones was retried and again convicted of special circumstance murder and other crimes.  On appeal, he argues the trial court erred by admitting his custodial statements and denied him the relief required by the California Racial Justice Act of 2020[1] (Pen. Code[2], § 745; the Act) for the race-based discrimination during jury selection that occurred in his first trial.  We affirm.

---

[1]     "In 2020, the California Legislature enacted the Racial Justice Act [citation], which went into effect on January 1, 2021. Its declared intent is 'to eliminate racial bias from California's criminal justice system because racism in any form or amount, at any stage of a criminal trial, is intolerable, inimical to a fair criminal justice system, is a miscarriage of justice under Article VI of the California Constitution, and violates the laws and Constitution of the State of California.  Implicit bias, although often unintentional and unconscious, may inject racism and unfairness into proceedings similar to intentional bias.' [Citation]."  (*People v. Singh* (2024) 103 Cal.App.5th 76, 109.)

[2]     All further statutory references are to the Penal Code unless otherwise indicated.

# II. BACKGROUND

A.    *The Arrest*[3]

On October 18, 1988, defendant and George Marvin Trone, Jr. (Trone) abducted Lois Haro from a shopping mall in Pasadena.  While driving around the area in Haro's car, they committed sexual offenses against her including three rapes and forced oral copulation.  Defendant then shot Haro in the head and left her on the side of an isolated road.  A police officer on patrol discovered Haro later that evening and she died on the way to the hospital.

Police apprehended defendant the morning after the crimes after an officer observed him driving Haro's car.  Inside defendant's apartment, officers found Haro's belongings, including her pocketbook, wallet photograph insert, her identification, and three keys.  A live .38 caliber bullet was recovered from inside a jacket hanging in defendant's closet.[4] Officers also found a pair of wet, rolled-up underwear in the sink that appeared to have been washed; they were ultimately determined to be unrelated to the case.

Investigators tested defendant's hands for gunshot residue. They noticed a spot on defendant's pants that could have been blood, so they booked him and took his pants for evidence. During the booking process, a packet fell out of the crotch area of

---

[3]    The facts of the murder are taken from the testimony and evidence introduced at the second trial.

[4]    The bullet fragments removed from Haro's brain were consistent with the bullet recovered from defendant's jacket.  The gun was never recovered.

3

defendant's underwear which contained Haro's identification and credit cards.[5] Police recovered an automated teller machine (ATM) receipt from Haro's bank account and a key to her husband's truck from defendant's pants pocket.

Police arrested defendant on Wednesday morning, October 19, 1988 and he was arraigned two days later on Friday, afternoon, October 21, 1988. During the two days he was in pre-arraignment custody, he confessed to the crimes.

B.    *The Statements*

    1.    First Day Statements

On the morning of defendant's arrest, October 19, Pasadena Police Department detectives Brian Schirka and Don Gallon interviewed him at the station after he was advised of and waived his *Miranda*[6] rights. They recorded the interview with a visible tape recorder. The initial interview, which lasted approximately an hour, was interrupted when Gallon noticed a spot of blood on defendant's pants and decided to book him.

Prior to booking, defendant denied any involvement in the crimes. He told the police that he was with Trone at the Pasadena Mall between 8:10 and 8:45 p.m. the previous night, but at home by 10:30 p.m. where he remained until the police arrived in the morning. But when detectives disclosed that witnesses saw defendant driving Haro's car early that morning,

_____

[5]    Defendant later said he found Haro's credit cards in her car.

[6]    *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

4

defendant explained that a friend brought the car to his house that morning and he took it for a brief drive. Gallon asked, "And when did you take the license plate off?" Defendant denied touching the license plate, but then asked "Can y'all prove I did that?" Eventually, he admitted touching the plates, then said he removed the rear plate because his friend asked him to do so.

After defendant was booked, Schirka and Gallon reminded defendant of his *Miranda* rights and asked defendant if he was still willing to talk to them. Defendant waived his rights and the detectives resumed questioning. Before the break, Gallon told defendant his hands had tested positive for gunshot residue. Defendant explained that he had shot a BB gun earlier that week. But after the break, he admitted Trone had a gun which defendant handled earlier that day at defendant's sister's house.

Gallon next told defendant that investigators had used a "mass spectrometer" which showed defendant had physical contact with Haro.[7] Defendant denied touching Haro and denied having sex with anyone that night. Gallon claimed he knew defendant killed Haro or was at least present; he encouraged defendant to "look out for number one" and tell the police if he was merely present for the murder. Gallon suggested defendant might have made a mistake, and it would benefit him to admit it. Defendant then admitted he was present but denied touching Haro. He said, "[Trone] touched her, I touched him."

---

[7]    This was a ruse. At the time of the interviews, detectives did not yet know if Haro had been sexually assaulted. They told defendant they had a light that could detect if a stain contained biological fluid, which was true. DNA reference samples were collected from Haro, defendant, and Trone, but at the time, DNA typing was not yet available.

5

Defendant provided a new version of the night's events in which Trone was with Haro driving her car when they came to the park and asked defendant if he wanted to go for a drive with them. Defendant thought everything was "normal" because Trone was a "gigolo" and Haro did not seem scared. Defendant drove and Haro sat in the front seat. He did not know Trone had a gun until Trone threatened Haro with it when she failed to comply with his commands to get in the back seat with him. Defendant said he pulled the car over on the freeway, and Haro got in the backseat with Trone. Defendant resumed driving while Trone forced Haro to orally copulate him and then raped her twice. At that point in the interview, defendant denied having sexual contact with Haro himself. Defendant said that Trone killed Haro after he told defendant to pull over near a bridge known as "suicide bridge" because Haro could identify them. Defendant then dropped Trone off at the park and took Haro's car home.

Gallon thanked defendant for being honest, but falsely told him that investigators had "physical evidence" suggesting defendant touched Haro with his penis. In response, defendant admitted touching Haro with his penis, but said he did not touch her vaginal area because she had her hand in the way. When asked if he ejaculated, he said, "No. No—not really," but then admitted "it just dripped." Gallon pressed defendant to admit he had inserted his penis inside Haro, and defendant agreed he had inserted just "the tip." But he claimed he withdrew before he was going to ejaculate.

Detectives also confronted defendant with the ATM transaction record they found in his pocket, which showed someone used Haro's ATM card to withdraw $40 at 9:48 p.m.

6

from her bank account. Defendant denied using Haro's ATM card and said he did not see Trone use it either. The detectives repeatedly asked defendant about the wet underwear found in his home, and he consistently denied knowing anything about it.

Toward the end of the morning interview, defendant asked Schirka "how much time" a person convicted of murder serves. Schirka replied that it depended on the degree. Gallon explained detectives had "no say" in punishment, adding, "I can't make any promises to you" and "But as far as ... me getting you any leniency or anything like that, I can't do that, but I can tell them you were truthful. And you and I both know that ... if you had a choice between two people, you would rather talk to somebody that was being truthful than to someone that was lying."

At the end of the interview, Gallon asked, "[D]id we make you any promises that we were gonna give you an easy time or anything if you talk to us?" Defendant answered, "Nope. You just promised that you'll go over and talk to the District Attorney about it."

2.      Second Day Statements

The next day, October 20, Gallon received word that defendant wanted to talk to him, and they had another conversation. Defendant told Gallon he was worried about the positive result of the gunshot residue test and wanted to explain. At that point, the detective repeated the *Miranda* advisement, and defendant again waived his rights. Gallon transcribed defendant's statements as follows: "October 20, 1988 [¶] 1240 hrs[.] [¶] When [Trone] shot that lady I was close behind him and at an angle near his right shoulder. So if the gun test is positive for me, then the flash of the gun may have hit my hand[.]

7

[¶] Right after [Trone] fired the gun within a few seconds he dropped the gun in the car and I picked it up right away and then gave it back to him." Defendant signed the statement, indicating he agreed.

Around 7:50 p.m. that night, detectives Lionel Salgado and Schirka interviewed defendant at the police station. The interview was not recorded, but Schirka took notes. Schirka renewed the *Miranda* advisement, and defendant waived his rights. The detectives told defendant that they had just interviewed Trone and confronted defendant with Trone's statements. They accused defendant of shooting Haro; he did not respond. Then, defendant admitted he and Trone abducted Haro from the Pasadena Mall parking lot near the escalators at JC Penney. They robbed Haro of $12 in cash, a watch, and some rings. Defendant claimed he did not get anything from the robbery.[8] Defendant said that he did not know where the gun was, but guessed it might be at Trone's girlfriend's house. Detectives who followed up on that information recovered Haro's watch from Trone's girlfriend's residence.

---

[8]     As previously noted, defendant was arrested in possession of many of Haro's belongings, including her pocketbook, her wallet photograph insert, her identification, her credit card, her car keys, and her car.

### 3. October 21 Car Ride Statements

The next morning, October 21, as detectives Salgado and Richard Cassidy[9] were transporting defendant to the hospital to have his biological samples collected, defendant asked what he was "going to get for this." During the 10-minute drive from the police station to the hospital, Salgado, who was in the back seat with defendant, explained a judge and jury would "decide the outcome of what he was going to get." Salgado further explained the job of a detective was "to figure out what happened and who did what and what went on, and that … Schirka was in charge of the investigation." Defendant told Salgado that he remembered him from the interview with Schirka the previous night. Salgado then said he believed defendant shot Haro. Defendant replied, "'I guess I'll tell you the truth then.'" He said he and Trone were going "to get rid of her," and initially it was Trone that got out of the car with Haro. Trone told Haro to sit down and he pointed the gun at her with the hammer cocked. Then defendant joined Trone and told Haro to get on her stomach. Defendant put his hand over the gun that Trone was holding, defendant's "hand slipped into the trigger and ... the gun went off."

According to Cassidy, the atmosphere in the car was "very low key, professional." They did not raise their voices or pressure defendant, and the conversation never became contested or controversial. Salgado "had no intention" of interviewing defendant that morning. He did not have a notepad or recording device, so he took notes on an evidence envelope while he sat next

---

[9] Detective Richard Cassidy was unavailable to testify at the second trial. His testimony from the first trial was read into the record.

to defendant in the back seat and defendant continued talking. Salgado did not ask defendant any questions. He was aware that defendant had been *Mirandized* several times before, including the night prior when he interviewed defendant with Schirka.

### 4. October 21 Hospital Interview

When the detectives arrived at the hospital with defendant, they took him to an interview room within the emergency department. They renewed his *Miranda* advisement and he waived his rights. He repeated the story he had told the detectives in the car. Salgado told defendant he did not believe Trone was near the gun when it went off. Defendant put his head down and said, "'Okay. I shot her.'"

Salgado stopped the conversation to borrow a tape recorder from hospital staff. Once recording, Salgado again reminded defendant of his *Miranda* rights and defendant waived them. Defendant stated that Trone made Haro sit down, and defendant "went over there by [Trone] and picked the gun [*sic*] and [defendant] shot her." Defendant clarified that he told Haro to "'lay on [her] stomach'" and "that's when [he] took the gun" from Trone. Salgado asked, "And what did you do?" Defendant again said, "I shot her." Defendant explained that Trone was worried Haro would report them to the police and said they needed to get rid of her. When Trone had the gun pointed at Haro, however, he was listening to her talk and he acted like he did not want to pull the trigger. Defendant "just went over there and like got [the gun] from him and did it within two seconds and left." Defendant insisted he did not know what Trone did with the gun after the

10

shooting. Defendant confirmed that the detectives had not made any promises to him or threats.

On the way back to the police station, defendant "volunteered" to tell Trone that he had admitted shooting Haro and to suggest that Trone tell the police where he put the gun. Detectives brought Trone to defendant, and defendant said, "'I told them I shot the girl so tell them where the gun is at.'"

## C. *Procedural History*

In an information filed on April 28, 1989, the Los Angeles County District Attorney charged defendant with five counts. Count 1 charged murder (§ 187, subd. (a)), with special circumstances that the murder was committed during a robbery, a kidnapping, a rape, and an oral copulation (§ 190.2, subd. (a)(17)). It was further alleged that defendant personally used a firearm (§§ 1203.06, subd. (a)(1); 12022.5), and that a principal was armed with a firearm (§ 12022, subd. (a)). Count 2 charged kidnapping to commit robbery (§ 209, subd. (b)), with an allegation that a principal was armed (§ 12022, subd. (a)). Count 3 charged second degree robbery (§ 211) with an allegation that a principal was armed (§ 12022, subd. (a)). Count 4 charged forcible rape in concert (§ 264.1) and count 5 charged forcible oral copulation (§ 288a, subd. (c)).

On April 11, 1991, a jury found defendant guilty of all counts and found all the special circumstance and enhancement allegations to be true. After a penalty phase trial, on May 7, 1991, the jury returned a verdict of death. The court sentenced defendant to death on count 1. The court also imposed the high term of five years for the firearm use enhancement plus one year for the armed principal enhancement, which was stayed. On the

11

remaining counts, defendant was sentenced to life without the possibility of parole on count 2, plus the high term of nine years on count 4, plus the high term of eight years on count 5. A high-term sentence of five years was imposed and stayed on count 3.

On direct appeal to the California Supreme Court, defendant argued the trial court erred when it denied his motions to set aside the information (§ 995) and to exclude the defendant's statements (Evid. Code, § 405) on the basis that his October 19 statement to Gallon was coerced by promises of leniency and the use of deception, and the subsequent statements, as the product of the first, were therefore also illegally obtained. (*People v. Jones* (1998) 17 Cal.4th 279, 297–299 (*Jones I*).) The Supreme Court determined "the prosecution met its burden of proving that there was nothing improper about the interrogations on the day of defendant's arrest" and "the initial interrogations did not produce any involuntary incriminating statements." (*Id.* at pp. 298–299.)[10] The Supreme Court affirmed defendant's conviction and death sentence on January 29, 1998.[11] (*Id.* at

---

[10] In his first direct appeal, defendant contended that his October 20 and 21 statements should be excluded on the additional grounds that they were procured after an unreasonably delayed arraignment in violation of the Fourth Amendment and the failure to readvise him of his rights under *Miranda.* The Supreme Court deemed these supplemental arguments forfeited by defendant's failure to raise them in the trial court. (*Jones I, supra,* 17 Cal.4th at p. 299, fn.1.) He raised those arguments again before his retrial.

[11] The court modified the sentence on count 2 to life with the possibility of parole.

12

p. 319.) The United States Supreme Court denied certiorari on October 13, 1998, in Case No. 98-5094.

On September 30, 2021, the district court granted defendant federal habeas relief on the ground that jury selection "was incurably tainted by race-based discrimination." The court determined that the prosecutor's use of four peremptory strikes to remove all the Black prospective jurors violated defendant's equal protection rights under *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*). Accordingly, it vacated the conviction and ordered the prosecutor to either release or retry defendant.

On January 7, 2022, the District Attorney notified the Los Angeles Superior Court trial court that he intended to retry the defendant but would no longer pursue the death penalty.[12]

On September 18, 2024, just prior to retrial, defendant moved to exclude his custodial statements. He renewed the arguments rejected by the Supreme Court that his admissions were involuntary because the first statements were "a direct result of [the detective]'s promises of leniency and improper use of deception," his arraignment was unreasonably delayed, and the police failed to renew his *Miranda* advisement before the October 21 car ride to the hospital. He also argued that his last confession at the hospital on October 21, although made after a *Miranda* advisement, was wrongfully elicited by a two-step interrogation technique prohibited by *Missouri v. Seibert* (2004) 542 U.S. 600.[13]

---

[12] Defendant was retried on the original information.

[13] In *Missouri v. Seibert*, *supra*, 542 U.S. 600, a plurality of the court held that when an interrogating officer deliberately withholds *Miranda* warnings, a midstream recitation after

13

The trial court first determined that under the doctrine of the law of the case it was bound to follow the Supreme Court's 1991 decision that all of the statements were voluntary and admissible. "In the alternative," the court said it would make an independent "determination with regard to the voluntariness, not just the first set of statements, but the second and third."

The parties agreed that the motion to exclude the statements would be based on the record of the previous trial in lieu of live testimony. After hearing argument, the trial court ruled the custodial statements were voluntary and admissible. The court found that detectives advised defendant of his constitutional rights under *Miranda* immediately before each of his four custodial interrogations and defendant knowingly and intelligently waived his rights. With respect to the October 21 car ride, the court found an advisement was not necessary because it was not an interrogation and, even if it were, "defendant was advised of these [*Miranda*] warnings ... in fact, just ten hours ... before, with the same detective." The court found no indication that defendant's statements were not of his free will and observed that "[defendant] didn't come off as a naïve follower. [Defendant] is actually articulate, he's pretty smart, and he was dodging and weaving throughout all of these statements, to kind of anticipate different things that might come up."

The trial court rejected defendant's two-step interrogation argument outright because not only had defendant been advised of his *Miranda* rights four times before defendant claimed he was

interrogation and an unwarned confession do not comply with *Miranda*'s warning requirement. (*Id.* at p. 622 (conc. opn. of Kennedy, J.).)

14

lured into making an unwarned statement, but "the defendant was already talking. He was talking to everybody." The court also rejected defendant's contention that his arraignment was unreasonably delayed, stating first that the issue had already been litigated and adding that because defendant was arraigned within the two-day requirement of state law "[h]e was not denied [due process]." Based on the foregoing, the court denied defendant's motion to exclude his custodial statements.

Before retrial began, defendant pled guilty "for tactical reasons" to counts 2 through 5 (all charged crimes other than murder), admitted the related firearm allegations, and admitted that he was a major participant who acted with reckless indifference to human life when committing those crimes. On October 1, 2024, a jury found defendant guilty of the remaining charge of first degree murder. The jury found the special circumstance allegations true and found that a principal was armed with a firearm. The jury was unable to make a unanimous finding on whether defendant personally used a firearm.

The trial court sentenced defendant as follows: life without the possibility of parole plus one year for the armed principal enhancement on count 1; a consecutive term of life plus one year for the armed principal allegation on count 2; two years and four months, stayed, on count 3; a consecutive low term of five years on count 4; and a consecutive two years on count 5.

Defendant filed a timely notice of appeal.

15

## III. DISCUSSION

A.    *Admissibility of Defendant's Custodial Statements*

On appeal, defendant contends the trial court erred by denying his motion to exclude his custodial statements and allowing the prosecutor to introduce them at trial.  He argues that:  (1) the law of the case does not apply; (2) his October 19 statements were coerced by promises of leniency and the use of deception; (3) his October 20 and 21 statements were coerced by an unreasonable delay in arraignment; and (4) his October 21 statements are inadmissible because he was not readvised of his *Miranda* rights before the car ride and his statement at the hospital was elicited as a result of a prohibited two-step interrogation.

### 1.    <u>The law of the case</u>

The Attorney General argues that under the doctrine of the law of the case, the Supreme Court's previous ruling that defendant's statements were voluntary and admissible controls the outcome.  Defendant suggests the doctrine should not apply when a conviction is vacated by a federal court granting habeas relief, but admits he can find no authority to support that view.  At minimum, according to defendant, the law of the case doctrine cannot apply to the arguments the Supreme Court deemed forfeited, namely failure to re-*Mirandize* defendant and the

16

alleged delay in arraignment, because those issues were not decided.[14]

"Under the law of the case doctrine, when an appellate court '"states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout [the case's] subsequent progress, both in the lower court and upon subsequent appeal … .'" [Citation.]" (*People v. Barragan* (2004) 32 Cal.4th 236, 246 (*Barragan*).) The doctrine "'prevents the parties from seeking appellate reconsideration of an already decided issue in the same case absent some significant change in circumstances.' [Citation.]" (*People v. Boyer* (2006) 38 Cal.4th 412, 441 (*Boyer*).) "'Application of the rule is now subject to the qualifications that "the point of law involved must have been necessary to the prior decision, that the matter must have been actually presented and determined by the court, and that application of the doctrine will not result in an unjust decision." [Citations.]' [Citation.]" (*People v. Ramos* (1997) 15 Cal.4th 1133, 1161 (*Ramos*).)[15]

---

[14]    In the interests of justice, defendant urges us not to apply the doctrine because the Supreme Court's review was nearly 30 years ago and standards of decency with respect to the interrogation of young people have evolved in the intervening period.

[15]    "An 'unjust decision' may result when 'the controlling rules of law have been altered or clarified by a decision intervening between the first and second determinations of the appellate courts. [Citations.]' (*DiGenova v. State Board of Education* (1962) 57 Cal.2d 167, 179–180; *People v. Stanley*[(1995)] 10 Cal.4th [764,] 787.)" (*Ramos, supra,* 15 Cal.4th at p. 1161.)

Defendant has shown no basis to treat this case differently because his conviction was overturned by a federal habeas court rather than a state court. Whether a judgment of conviction is reversed after direct appeal or vacated after a state or federal petition for writ of habeas corpus, the case is returned to a pretrial posture as if the defendant had never been tried and convicted. (*People v. Mack* (2002) 97 Cal.App.4th 1010, 1014–1015; *People v. Cooper* (2007) 149 Cal.App.4th 500, 523.) Accordingly, we conclude the law of the case doctrine does apply to give binding effect to the Supreme Court's ruling on the issue of the voluntariness of defendant's custodial statements.

In his direct appeal of the first conviction, defendant challenged the first trial court's rulings denying his motions to suppress his confessions under sections 995 and 405. (*Jones I*, *supra*, 17 Cal.4th at p. 296.) The Supreme Court addressed the admissibility of all five of the defendant's statements and found them all voluntary. (*Id.* at p. 299.) That is the law of the case and must be adhered to "'whether . . . right or wrong.'" (*Barragan*, *supra*, 32 Cal.4th at p. 246.) Even if defendant has new challenges to the voluntariness of the statements, the court is bound by the law of the case, unless he presents new evidence or there has been an intervening change in the law. (*Id.* at pp. 246–247; *Boyer*, *supra*, 38 Cal.4th at p. 442; *Ramos*, *supra*, 15 Cal.4th at p. 1161.) Accordingly, based on the law of the case doctrine, we reject defendant's contentions that his statements were not voluntary. Because, however, the Supreme Court concluded that defendant had forfeited his argument that his statements should be excluded because the police failed to re-*Mirandize* him, and because of an alleged delay in his arraignment and defendant raised these arguments in the trial

18

court in advance of his second trial, we will consider the merits of his arguments below.

### 2. Failure to renew *Miranda* advisement

Defendant contends that his statements to Salgado on October 21 were taken in violation of *Miranda*, *supra*, 384 U.S. 436 because (1) he was not advised of his rights before the 10-minute car ride and (2) the confession made at the hospital after Salgado did renew the advisement was the product of two-step questioning prohibited in *Missouri v. Seibert*, *supra*, 542 U.S. 600.

As a threshold matter, "if 'custodial interrogation' is lacking, *Miranda* rights are not implicated ... ." (*People v. Mickey* (1991) 54 Cal.3d 612, 648 (*Mickey*).)  The trial court found that the conversation in the police car was not an interrogation for purposes of *Miranda* analysis, and we review that finding for substantial evidence or clear error.  (*People v. Clark* (1993) 5 Cal.4th 950, 985, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421.)  As used in the context of *Miranda*, *supra*, 384 U.S. 436, interrogation includes any words or actions on the part of the police that they should know are reasonably likely to elicit an incriminating response from the suspect.  (*People v. Clark*, *supra*, 5 Cal.4th at p. 985.)  It does not include all conversation between an officer and a suspect where a defendant makes incriminating statements.  (*Mickey*, *supra*, 54 Cal.3d at p. 648 [no interrogation when police responded to defendant's question regarding the burial of his victims, lost his composure and made incriminating statements].)

Salgado and Cassidy were responsible for taking defendant to the hospital to retrieve blood, saliva, and hair samples. Salgado testified that he "had no intention" of interviewing defendant, which testimony was corroborated by his lack of notepad or recording device. Salgado did not ask defendant any questions. When defendant started making admissions, Salgado improvised by taking notes on the evidence envelope he had brought for the biological samples. As Cassidy explained, the atmosphere in the car was "very low key, professional." The detectives did not raise their voices or pressure defendant, and the conversation never became contested or controversial. Defendant initiated the conversation that morning by asking about his possible punishment. Defendant's unsolicited admission was an unexpected response to Salgado answering his question and then offering an opinion about defendant's role in the crime. Substantial evidence therefore supports the trial court's finding that defendant was not interrogated during the car ride to the hospital.

In addition, we reject the assertion that the detectives were required to readvise defendant of his *Miranda* rights for the car ride. "[R]eadvisement is unnecessary where the subsequent interrogation is 'reasonably contemporaneous' with the prior knowing and intelligent waiver. [Citations.] The courts examine the totality of the circumstances, including the amount of time that has passed since the waiver, any change in the identity of the interrogator or the location of the interview, any official reminder of the prior advisement, the suspect's sophistication or past experience with law enforcement, and any indicia that he subjectively understands and waives his rights." (*People v. Mickle* (1991) 54 Cal.3d 140, 170 (*Mickle*).)

20

Here, although the location of the conversation had changed to the car, it was clear from the circumstances that defendant was still in official custody. He was handcuffed in the back of a police car and headed to the hospital to fulfill the mandate of a search warrant. He could reasonably be expected to know that any statements made at this time might be used against him in the investigation and any subsequent trial. (See *Mickle*, *supra*, 54 Cal.3d at p. 171.) Further, defendant recognized Salgado from his earlier interactions with him and Salgado was the same detective who, with Gallon, gave defendant the *Miranda* advisement the night before. (See *ibid*.) Defendant was advised of and waived his right to remain silent four times within the previous 48 hours. (See *ibid*.) Under these circumstances, the trial court's conclusion that "defendant was well aware with regard to his *Miranda* rights" was supported by substantial evidence. The police therefore were not required to renew the *Miranda* advisement prior to transporting defendant to the hospital. (See *id*. at p. 170 [defendant's statements in fourth interview were voluntary where it was given 36 hours after last warning by the same two detectives who had previously admonished him]; *People v. Thompson* (1992) 7 Cal.App.4th 1966, 1972–1973 [nine-hour interval between advisement and confession did not violate *Miranda* where the defendant confessed to the same officer who had previously advised him of his rights]; *People v. Johnson* (1973) 32 Cal.App.3d 988, 997 [defendant's statements were voluntary where he was given multiple warnings during seven interviews over nine days].)

Defendant additionally argues that the police engaged in an impermissible two-step interrogation on October 21, luring defendant into an unwarned confession in the car before advising

him of his *Miranda* rights at the hospital and resoliciting an admissible confession.  We disagree.  Defendant was advised of and waived his constitutional rights to silence and counsel four times *before* the car ride to the hospital on October 21.[16]  Because a *Miranda* advisement was not required, we reject defendant's argument.

### 3.    Unreasonably delayed arraignment

Although he was arraigned within the two days required by statute[17], defendant maintains that his confessions on October 21 were the product of an unreasonable delay in arraignment in violation of the Fourth Amendment.

"Persons in custody must be arraigned without unnecessary delay.  (Cal. Const., art. I, § 14; *County of Riverside v. McLaughlin* (1991) 500 U.S. 44, 56–57 [probable cause determination ordinarily should occur within 48 hours of a warrantless arrest]; see §§ 825 [arraignment ordinarily should occur within 48 hours, excluding Sundays and holidays], 859 [appearance before a magistrate should occur without

---

[16]    Defendant was first advised on the morning of his arrest and reminded when questioning resumed after he was booked that morning.  The following day, defendant initiated a conversation with Gallon, who readvised him around noon.  At 7:51 p.m. that evening, defendant was interviewed by Salgado and Schirka, who readvised defendant of his rights, marking the fourth time in about 36 hours.

[17]    As noted, the police arrested defendant on Wednesday morning, October 19, and defendant was arraigned on Friday afternoon, October 21.

unreasonable delay after charge by written complaint]; *People v. Hughes* (2002) 27 Cal.4th 287, 325.)" (*People v. Williams* (2010) 49 Cal.4th 405, 446 (*Williams*).) But to justify exclusion of a statement based on delayed arraignment, a defendant "must show that the delay produced his admissions or that there was an essential connection between the illegal detention and admissions of guilt." (*People v. Turner* (1994) 8 Cal.4th 137, 176 (*Turner*); accord, *People v. Thompson* (1980) 27 Cal.3d 303, 329–330 (*Thompson*).)

As the trial court found, defendant was arraigned within two days of his arrest as required by section 825. Further, nothing in the record suggests that a two-day delay was unreasonable under the circumstances. The case against defendant involved potential charges of murder, kidnapping, rape, robbery, and the concomitant special circumstances. In view of the complexity of the charging decisions involved, including the discernment of two suspects' levels of culpability, the delay was not unreasonable. (See, e.g., *People v. Bonillas* (1989) 48 Cal.3d 757, 787–788 [four days between arrest and arraignment was not unreasonable where case involved potential charges of murder and special circumstances and the charging decisions involved were complex]; *Turner*, *supra*, 8 Cal.4th at p. 175.)

In any event, even if defendant's arraignment were unreasonably delayed, defendant cannot demonstrate the ""'essential connection between the illegal detention and the confession'"" because he initiated the incriminating statement he made to Salgado in the police car on the way to the hospital on the second court day after his arrest. (See *Williams*, *supra*, 49 Cal.4th at p. 446, quoting *Thompson*, *supra*, 27 Cal.3d at p. 330.)

23

B.      *Violation of the Act*

Defendant next contends that the trial court erred by ruling that the appropriate remedy for violation of the Act was a declaration that defendant was ineligible for the death penalty. He argues the court's remedy was insufficient as a matter of law because ineligibility for the death penalty is a "categorical prohibition" under subdivision (l) of the Act, not a remedial option.  As defendant reads the Act, the court was required to impose an additional remedy against the prosecutor as a sanction.  (§ 745, subd. (l).)

As we describe above, the district court granted defendant federal habeas relief on the ground that the prosecutor used peremptory strikes to remove all the Black jurors.  After his return to superior court, defendant filed a motion claiming the "government's egregious conduct" in the first trial violated the Act and seeking, as a remedy, reduction of his murder charge or dismissal of the special circumstances or enhancements.  The prosecutor conceded the Act was violated in the first trial, but argued the issue was moot because the federal court remedied the violation when it vacated the conviction.  On June 4, 2024, the trial court ruled the appropriate remedy was ineligibility for the death penalty under former section 745, subdivision (e)(3).[18]

The Attorney General argues that the Act does not encompass racially discriminatory peremptory challenges because its plain language does not include jury selection and the legislative history reveals the Legislature's express intent to exclude bias directed at potential jurors from the scope of section

---

[18]     On August 16, 2024, the court denied the defense motion for reconsideration.

24

745 and instead address it through a separate statutory scheme. Defendant responds that the argument borders on "absurdity" but offers no further explanation.

Even if we were to assume, without deciding, that the Act applied to the discriminatory use of peremptory challenges, we would reject defendant's argument. According to defendant, the trial court was required to impose a remedy for the prosecutor's discriminatory use of peremptory challenges during the first trial. The federal district court, however, had already vacated the conviction that resulted from the proceedings in the first trial, the remedy set forth at section 745, subdivision (e)(2)(A), and defendant was thereafter retried on the information. The judgment on review in this appeal was based on the proceedings in the retrial, about which defendant raises no challenge under the Act. Thus, on this record, we conclude that defendant did not state a prima facie claim for relief under the Act.

## IV.    DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


KIM (D.), J.


We concur:



HOFFSTADT, P. J.



MOOR, J.


26